[No. 65376-3. En Banc.]
Argued October 19, 2000. Decided March 22, 2001.

THE STATE OF WASHINGTON, *Respondent*, v. PAUL C. GORE, *Appellant*.

*George W. Cody* and *David W. Lee*, for appellant.

*James H. Krider, Prosecuting Attorney*, and *Seth Aaron Fine, Deputy*, for respondent.

MADSEN, J. — Defendant Paul C. Gore challenges his convictions for two counts of first degree rape and two counts of attempted first degree rape. He contends that he

was improperly denied a *Franks*[1] hearing on the sufficiency of an affidavit in support of probable cause to issue a search warrant for blood and saliva samples, and photographs of the defendant; that the trial court erred in admitting DNA (deoxyribonucleic acid) evidence; that the trial court erred in imposing exceptional sentences where the factual basis for imposing exceptional sentences upward was not charged, submitted to the jury, and proved beyond a reasonable doubt; and that the trial court erroneously imposed exceptional sentences based upon victim vulnerability and upon preparation and planning of the offenses. We affirm Gore's convictions and exceptional sentences.

## Facts

Defendant was convicted of two counts of first degree rape and two counts of attempted first degree rape. He was acquitted on a third count of attempted rape. The facts are briefly set forth here. Additional facts relating to Gore's challenges will be set forth in the discussion of the issues.

Count 1. On February 17, 1993, 12-year-old A.O. was walking to school on a wooded trail. She saw a man she had seen the day before. He walked onto the trail, then turned and grabbed her. He dragged her off the trail and raped her. DNA found in semen in A.O.'s underpants was tested by two laboratories, each of which found a match with Gore's DNA. The FBI (Federal Bureau of Investigation) lab results showed that the likelihood of a random match using restricted fragment length polymorphism analysis was less than 1 in 90 million. The second lab conducted polymerase chain reaction tests, and determined the likelihood of a random match was 1 in 34,000 Caucasian Americans.

Count 2. In February 1994, K.S. was walking to catch a bus to work when she encountered a man on the street. A few days later, on February 11, she encountered the same man wearing a ski mask. He picked her up from behind and carried her into nearby woods. He stuck a knife in her back

---

[1] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

and tried to tie her, but she struggled. She was not sure whether he raped her.

Count 4. On April 13, 1995, 14-year-old C.C. was going to school using a trail through woods. A man grabbed her from behind, dragged her off the trail, and raped her. C.C. did not pick Gore's picture out of a photomontage; instead she picked another person. This fact was not included in an affidavit in support of a search warrant issued July 5, 1995.

Count 5. On May 9, 1995, 13-year-old H.L. was walking home on a trail through woods when a man grabbed her, dragged her along the trail and threw her down. He apparently saw some people, and ran off. Kevin Craft lived nearby and at approximately the time of the attack saw a car parked in front of his house that was later traced to Gore. He saw a man jump from the car and run into the woods. Mr. Craft did not select anyone from a photomontage in which Gore's picture appeared. This fact was not included in the affidavit in support of the July 5, 1995, search warrant.

The July 5, 1995, search warrant was based upon an affidavit signed by a Lake Stevens officer, but largely prepared by a Snohomish County officer. It authorized the seizure of blood and saliva samples, and photographs of Gore. A second search warrant was issued in December, again based in part on information supplied by the Snohomish County officer. Gore moved to suppress the evidence obtained under both of the warrants on the grounds that the supporting affidavits omitted material facts—including the fact that C.C. picked another person in the photomontage and the fact that Mr. Craft did not pick Gore's picture out of the photomontage. As to the July 5, 1995, search warrant, the trial court, Judge Krese, held that omitted material was not material to the probable cause determination. As to the second search warrant, a different judge, Judge Castleberry, held an evidentiary hearing, at the conclusion of which he found that omitted material was not material and that the omissions were not made deliberately or with reckless disregard for the truth.

Both suppression motions were denied. On appeal, Gore challenges the validity of the first search warrant.

A seven-day pretrial hearing was held to determine admissibility of DNA evidence under *Frye*[2] and ER 702. The trial court ruled that the particular DNA typing techniques used are admissible, and also ruled that the product rule could be used to calculate the probability of a random match in the human population of the genetic profiles detected.

Following Gore's convictions, the trial court imposed consecutive sentences for the offenses as required by RCW 9.94A.400(1)(b) and RCW 9.94A.030(34).[3] The court then imposed exceptional sentences for all of the offenses based upon victim vulnerability due to the small size of the victims and, in the case of three of the victims, their young age as well, and based upon the defendant's preparation for and planning of the offenses. Gore was sentenced to 228 months on count 1, 204 months on count 4, and 120 months on counts 2 and 5.

Gore's motion for direct review by this court was granted.

## Analysis

### I. Sufficiency of the affidavit in support of the search warrant

Gore contends that material facts were omitted from the affidavit in support of the July 5, 1995, search warrant. The July 5, 1995, search warrant for saliva, blood, and photographs of Gore was prepared following a meeting between Detective Terry Deverse of the Everett police, who was investigating the attack on H.L., Officer Ron Brooks of the Lake Stevens police, who was investigating the rape of

---

[2] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[3] The 2000 Legislature enacted Senate Bill 6223, which rewrote portions of the Sentencing Reform Act of 1981 (SRA) to clarify it, given that numerous prior amendments to the act had resulted in some sections becoming "unduly lengthy and repetitive." LAWS OF 2000, ch. 28, § 1. The new amendments are not intended to effect any substantive changes in the law. *Id.*

C.C., and Detective James Scharf of the Snohomish County Sheriff's Office, who was investigating the rape of A.O. and the attack on K.S. The affidavit was signed by Brooks but largely prepared by Deverse, and described the attacks on C.C. and H.L.

Gore contends that two material facts were omitted from the affidavit:[4] First, that Mr. Craft, the witness who saw a person jump out of a car near the crime scene of the attack on H.L., failed to identify Gore from a photomontage; and second, that victim C.C. selected another person from a photomontage in which Gore's picture also appeared.

■ ■ A search warrant may be issued only upon a determination of probable cause, which exists when an affidavit supporting the search warrant sets forth sufficient facts to lead a reasonable person to conclude that the defendant probably is involved in criminal activity. *In re Pers. Restraint of Yim*, 139 Wn.2d 581, 594, 989 P.2d 512 (1999); *State v. Cord*, 103 Wn.2d 361, 365-66, 693 P.2d 81 (1985). If a

> defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Allegations of negligence or innocent mistake are insufficient. *Franks*, 438 U.S. at 171; *State v. Garrison*, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992). If the defendant makes this preliminary showing, and at the hearing establishes the allegations by a preponderance of the evidence, the material misrepresentation will be stricken from the affidavit and a determination made whether as modified the affidavit supports a finding of probable cause. *Cord*, 103 Wn.2d at 367. If the affidavit fails

---

[4] Gore asserted to the trial judge that there were additional false or misleading material statements, but now challenges only the omission of the facts noted in the text.

to support probable cause, the warrant will be held void and evidence obtained pursuant to it excluded. *Id.*

The *Franks* test for material misrepresentations applies to allegations of material omissions. *Cord*, 103 Wn.2d at 367; *Garrison*, 118 Wn.2d at 873. If the defendant makes the required preliminary showing of intentional material omissions or material omissions made with reckless disregard for the truth, and establishes the allegations at a hearing by a preponderance of the evidence, the omitted material is included in the affidavit to make the determination whether the affidavit supports a finding of probable cause. *Garrison*, 118 Wn.2d at 873. If, as modified, the affidavit does not support a probable cause finding, the search warrant is invalid.

The biological samples and photographs named in the search warrant were sought as evidence that Gore committed the crime against C.C. However, the information in the affidavit concerns the crimes against both C.C. and H.L., with the facts tending to show that the same person committed both crimes. Information in the affidavit tended to establish probable cause to believe that Gore was the person who committed the crime against H.L. and, because the affidavit tended to show the same person committed both crimes, that evidence of the crime against C.C. would be found in and on Gore's person.

The affidavit provides that on April 13, 1995, in Lake Stevens, C.C. was walking through the woods to school when attacked from behind by a man who dragged her back to a pile of boughs and raped her. He was wearing a nylon mask (lady's hosiery) over his head which had an opening over his eyes either cut or torn into the nylon. C.C. did not recall any facial hair, and described the attacker's jacket as a thin black coat, possibly Gortex, and said that he wore blue jeans, possibly Levis. C.C. said the attacker was taller than she was (she was about five feet tall), and was a white, strongly built male. He had little or no pubic hair.

On May 9, 1995, in Everett, H.L. was grabbed from behind by a man while she was walking home through

woods, and was dragged backward to a pile of small cut branches. He had a full-face stocking mask with an oval tear for his eyes. He was wearing a dark parka with a possible purple stripe, of a rough material, possibly Gortex. He was interrupted by witnesses and ran away. The witnesses described the attacker as about five feet, nine inches tall and 175 pounds, with a medium build. Mr. Craft, who lived nearby, saw a car suddenly stop in front of his house on the day of the attack against H.L. at about 3:20 to 3:30 P.M. The driver jumped out and ran north on Second Avenue about 100 yards, then turned and entered a trail which ran through a heavily vegetated area. Mr. Craft described the man as about five feet, eight inches to six feet tall with dark hair. After a couple of minutes, Mr. Craft walked to the front of his property, noted the license plate number, and went into his house to write it down. When he returned, the car was gone. The car was in front of the house about five minutes. The car, a 1986 Chevy Sprint, was registered to Gore's wife. On June 1, 1995, Detective Deverse interviewed Gore at the Everett police department, and found he had a dark complexion, was about five feet, nine inches tall and about 160-170 pounds, and had short dark hair. Gore admitted he was driving his wife's car at the time of the assault and had stopped and gotten out of the car at the approximate location identified by Mr. Craft. Gore said he stayed within 10 feet of the car. Gore's wife told police he has very little pubic hair. According to the Snohomish County Medical Examiner, it is rare for an adult male with dark hair, which Gore has, to have little pubic hair. The affidavit also disclosed that the attacks occurred in areas where Gore was known to have worked.

In the trial court's findings and conclusions denying a *Franks* hearing, the court reasoned that as to H.L.'s case, the description of the attacker was consistent with the physical description of Gore. Also, witness Craft saw a car registered to Gore's wife stop about a block from the attack site and a man jump from the car and run into the woods where H.L. was attacked at about the time she was at-

tacked. The court said that a reasonable person would conclude that Gore probably assaulted H.L. The court then compared the two attacks, noting that both female victims were about the same age and were students who were attacked on wooded trails used to go to and from school. Both H.L. and C.C. described the attacker as wearing a mask, both attack sites had a bed of vegetation that appeared to have been prepared in advance, both attacks took place where Gore was known to have worked, though not necessarily on the days of the attacks, and both attacks took place in the afternoon on days when Gore was scheduled to work. Also, the attacks took place within one month of each other. The court determined that there was probable cause to believe that Gore committed both attacks, and consequently there was a likelihood of finding the type of evidence requested on Gore's person.

The trial court concluded that the omissions asserted by Gore are not significant to a determination of probable cause, and therefore Gore did not make the requisite preliminary showing that a *Franks* hearing was required. In light of this conclusion, Judge Krese did not examine the issue of whether the asserted omissions were intentional or made with reckless disregard for the truth. Turning first to the failure to state that C.C. had not identified Gore in a photomontage, but instead had selected another person, Judge Krese said that omission of this fact is not significant because a mask covered the attacker's face and the opportunity to observe was limited. As set forth in the affidavit, C.C. was attacked from behind and dragged back to the site of the attack. As to the second omitted fact, the judge said that the fact that witness Craft did not identify Gore in the photomontage as the person running from the vehicle and into the trail head where H.L. was attacked was not significant because of the limited opportunity for the witness to observe the man.

We agree that neither omitted fact is material to the determination of probable cause. The fact that C.C. did not pick Gore out of a photomontage is not material to the

determination of probable cause in light of her limited ability to see the attacker and the other information provided in the affidavit, although the fact that she identified someone else makes this a somewhat close question. As to Mr. Craft's failure to identify Gore, the witness had a limited opportunity to see a man running away from a car in front of his house. While Craft did see the man who got out of the car, and could describe him in general terms, the conditions described in the affidavit were such that he had little chance to see Gore very well. Also, other facts set out in the affidavit clearly tie Gore to the car in front of Mr. Craft's house—the license number and Gore's wife's statement that he had the car that day. Moreover, the affidavit also includes a report of an interview with Gore where he admitted to being at the Second Avenue site at the approximate time of the abduction, and said he got out of his vehicle there because it was having mechanical difficulties. (He also inconsistently said he did not get out of the vehicle.) Under these circumstances, the fact that Mr. Craft did not identify Gore in a photomontage is not material to the determination of probable cause.

As to both omitted facts, this case is similar to *State v. Copeland*, 130 Wn.2d 244, 277-79, 922 P.2d 1304 (1996), where the defendant asserted that the affidavit omitted the material fact that a witness who described a man in the vicinity of the crime failed to pick the defendant's picture out of a photomontage. As the court noted, the information in the affidavit made clear that the witness did not see the defendant, and thus her failure to pick him out of a photomontage added nothing which was not already apparent from the affidavit—she did not see the defendant. *Id.* at 279. Here, the information in the affidavit makes it apparent that neither C.C. nor Mr. Craft had much opportunity to see the individual, and therefore the fact that neither picked him out of a photomontage is not material.

Gore contends, however, that the intent of the affidavit was to link him to the attack on C.C. by establishing (1) parallels between the two assaults, (2) that Gore was in the

area at the time of the assault on H.L. as shown by Mr. Craft's information, and (3) that he was also in the Lake Stevens area when C.C. was attacked. He contends the omitted facts were intentionally omitted, and the omissions negate the inference that the same person committed the attacks.

As Gore contends, Detective Deverse largely prepared the affidavit and he knew that Mr. Craft did not identify Gore and that C.C. picked someone else, as he was the one who submitted the photomontages to them. If Mr. Craft and C.C. had identified Gore, it seems fair to conclude that Detective Deverse would have included these facts in the affidavit. However, the preliminary showing for a *Franks* hearing requires a showing of both intent (or reckless disregard) and materiality. As noted, the trial judge's decision denying the hearing was based on lack of materiality, and thus the judge did not need to reach the issue of intent.

Gore complains, though, that Judge Krese's conclusions about materiality are flawed because they are based on information that Deverse selectively included in the affidavit. He argues that under *Franks* he is entitled to a hearing to explore why the two facts were omitted. The difficulty with the argument is that regardless of whether Detective Deverse intentionally omitted the two facts to which Gore points,[5] the trial court found them immaterial in light of other facts included in the affidavit. Importantly, Gore does not contend that the facts that are in the affidavit are false —he simply argues that they must be tested in a hearing. *Franks* does not require a hearing in these circumstances, however.

Finally, we agree with the State that even if the omitted facts were material, their inclusion in the affidavit would not negate probable cause as to either offense. Thus, even if Gore were entitled to a *Franks* hearing, the warrant would

---

[5] With regard to the December search warrant, Judge Castleberry found that the omission of these same two facts from the affidavit in support of probable cause was not intentionally made or made with reckless disregard for the truth.

be valid and the evidence obtained pursuant to the warrant admissible.

## II. Admissibility of DNA evidence

Gore next contends that the trial court erred in admitting DNA evidence. DNA typing methods are designed to extract portions of DNA molecules and determine whether the genetic profile resulting from a forensic sample matches that of a suspect. Calculations are then made to determine the likelihood of a random match of the genetic profile in the human population. In this case, the challenged DNA typing involves polymerase chain reaction (PCR) based tests, i.e., the DQ-alpha, polymarker, and D1S80 systems, and the frequency calculations were made by determining the statistical frequency or product of the probabilities of each allele occurring in the population and then multiplying these frequencies by each other to calculate the probability of all of the alleles occurring together.

■■ The trial court held a *Frye*-ER 702 hearing. The primary goal of a *Frye* analysis is to determine whether the evidence offered is based on established scientific methodology. *State v. Russell*, 125 Wn.2d 24, 41, 882 P.2d 747 (1994). There must be both general acceptance in the relevant scientific community of the theory and of the technique used to implement the theory. *Id.*; *State v. Cauthron*, 120 Wn.2d 879, 889, 846 P.2d 502 (1993). Unanimity is not required. *State v. Copeland*, 130 Wn.2d 244, 270, 922 P.2d 1304 (1996). If there is a *significant* dispute among *qualified* scientists in the relevant scientific community, then the evidence may not be admitted. *State v. Gentry*, 125 Wn.2d 570, 585-86, 888 P.2d 1105 (1995). If the *Frye* test is satisfied, then the trial court must determine admissibility under ER 702. *Copeland*, 130 Wn.2d at 256. Here, the trial court ruled that both the typing techniques and use of the product rule are generally accepted in the scientific community and admissible.

Two laboratories tested DNA obtained from A.O.'s under-

pants. The State Patrol lab did restricted fragment length polymorphism (RFLP) testing. This method of DNA typing is described in *Cauthron*, 120 Wn.2d 879, and *Copeland*, 130 Wn.2d 244. At trial Dr. John Brown from the lab testified as to the RFLP testing. He testified that there was a match between the forensic sample and Gore's sample, and using a modified product rule, the interim ceiling principle,[6] calculated that the frequency of the DNA profile is 1 in 90 million. 13 Verbatim Report of Proceedings (VRP) at 1729 (trial). Using a second calculation (presumably using the product rule), he calculated the frequency at 1 in 100 million. Gore does not complain about the RFLP testing or this testimony. *Id.*

The second laboratory which tested a sample in A.O.'s case was Genelex Corporation, which conducted PCR testing using the DQ-alpha (described in *Russell*, 125 Wn.2d at 41), polymarker, and D1S80 systems. At trial, Dr. Vanora Kean, from Genelex, testified that Gore's blood control matched the semen DNA found on A.O.'s underpants. Dr. George Riley, also from Genelex, testified that based on the results of the PCR tests, the estimated frequency of the occurrence of the DNA profile of the forensic sample (the sperm donor) was 1 in 34,000 among Caucasian Americans.[7] He also testified that the PCR testing constituted a second test of the forensic sample.

There is no controversy over the underlying scientific

---

[6] In *State v. Jones*, 130 Wn.2d 302, 308-11, 922 P.2d 806 (1996), we explained that the interim ceiling principle was recommended in COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, DNA TECHNOLOGY IN FORENSIC SCIENCE 92 (National Academy Press 1992) to account for the possibility of substructuring in human populations. It was never intended to be scientifically precise, but was intended to provide an interim, conservative method for calculating a random match probability. In *Jones*, 130 Wn.2d at 311, we noted that the method was "widely accepted, given its admitted limitations," and rejected the defendant's claim that the interim principle was not generally accepted in the scientific community. As we predicted in *Jones*, use of the interim ceiling principle has declined substantially (if not completely) in the wake of a new report, COMMITTEE ON DNA FORENSIC SCIENCE: AN UPDATE, THE EVALUATION OF FORENSIC DNA EVIDENCE (National Academy Press 1996), which concluded that product rule calculations are appropriate, *id.* at 122-23, and rejected the ceiling principles, *id.* at 156-59.

[7] Dr. Riley also testified that with the most conservative calculation the lab used, the estimated frequency was 1 in 14,000.

theory of DNA typing; instead, Gore's challenges concern the validity of particular DNA typing techniques, but he does not present much argument on this point. Gore also challenges the statistical methods to determine the probabilities of a genetic profile occurring in the human population; he contends that there are unresolved, scientifically disputed issues which preclude use of the product rule when DNA typing is conducted using PCR-based systems. He raises no ER 702 admissibility issues on appeal.

■■ The court's review of a *Frye* ruling is de novo and involves a mixed question of law and fact. *Copeland*, 130 Wn.2d at 255; *see Russell*, 125 Wn.2d at 41. "The reviewing court will undertake a searching review which may extend beyond the record and involve consideration of scientific literature as well as secondary legal authority." *Copeland*, 130 Wn.2d at 255-56; *accord Cauthron*, 120 Wn.2d at 887-88. Materials that become available after the *Frye* hearing may be considered. *Copeland*, 130 Wn.2d at 256.

The hearing in this case lasted seven days, although much of the testimony concerned ER 702 issues. Dr. John Brown, a forensic scientist with a Ph.D. in biology employed by the Washington State Patrol in its crime laboratory division, Dr. Ranajit Chakraborty, a professor of biological sciences for biometrics at the Human Genetics Center, University of Texas, School of Public Health at Houston, and Mr. Howard Coleman, the president of Genelex, testified for the State. Dr. Lawrence Mueller, a professor in the Department of Ecology and Evolutionary Biology at the University of California at Irvine, Dr. Randall Libby, a molecular geneticist serving as a research consultant to a pharmaceutical company, and Dr. Daniel Kane, a professor in the Department of Biology at Wright State University at Dayton, Ohio, testified for the defense.

■ Although Gore does not present substantial argument on the admissibility of DNA typing using the DQ-alpha, polymarker and D1S80 systems, we briefly address the admissibility questions. DNA admissibility issues recur with some frequency and, needless to say, often involve

time-consuming, expensive *Frye* hearings. The trial judge here questioned whether a *Frye* hearing was even necessary as to admissibility of the polymarker and D1S80 techniques. After reviewing this record, we conclude that a *Frye* hearing on admissibility of the typing techniques was not necessary in this case, and will not be necessary for similar PCR-based systems in the future.

Although Gore appears to complain about admissibility of the results using the DQ-alpha system, we have already found that test results using the DQ-alpha locus are generally accepted in the scientific community and are admissible. *Russell*, 125 Wn.2d at 41-51, 54; *see Gentry*, 125 Wn.2d at 587. The test at issue in *Russell* used probes that identify six different alleles of the DQ-alpha gene, and the procedure is described in some detail in *Russell*. Gore has not suggested any reason to disturb our holding in *Russell*.

As to the polymarker system, Mr. Coleman, who is the president of Genelex, testified that polymarker is a test that uses "basically identical methodology" to DQ-alpha, but it tests six different genes rather than one. Dr. Chakraborty's testimony was in agreement, and defense expert Dr. Libby testified to the same effect. In that basically the same technique is involved as is involved when testing concerns the DQ-alpha locus, we conclude that admissibility of PCR-based results using the polymarker system was essentially determined in *Russell* and in *Gentry*.

As to D1S80, the experts agreed that testing uses techniques of both PCR and RFLP systems. Like other PCR testing, testing using the D1S80 locus involves copying a short segment of DNA millions of times, a process known as amplification. Dr. Chakraborty testified that the process then involves a technique like that of RFLP testing using electrophoresis to separate genes in a way that can be seen visually on autoradiograms. The differences between the latter part of the D1S80 testing and RFLP testing (*see Cauthron*) are that a different gel and a different stain are used, but the testing is "[b]ased on the same logic" and there is no "systematic difference in the procedure." VRP

(Oct. 3, 1996) at 40-41. Mr. Coleman also testified that D1S80 uses amplification like PCR and also involves a technique like RFLP testing in that the sample is applied to a gel and an electric current is run through it to separate the DNA based on size, and then the staining is done. Defense expert Dr. Libby termed the difference from other PCR techniques "significant," but agreed about the way in which the test is run. VRP (Oct. 7, 1996) at 118-19.

Although the D1S80 system involves techniques of both PCR and RFLP testing, the techniques involved are widely accepted in the scientific community.[8] More importantly for

---

[8] Mr. Coleman testified that all three techniques used in this case are generally accepted in the scientific community. Dr. Chakraborty testified that he had personally seen over 12 validation studies of polymarker testing, and about 15 validation studies for D1S80. Dr. Libby testified, however, that the polymarker and D1S80 techniques are not generally accepted. As the trial court noted in its oral ruling, though, the testimony of another defense expert, Dr. Krane, "clearly establishes that there are no real issues as to the acceptance" of polymarker testing. VRP (Oct. 16, 1996) at 15 (Judge's decision on admissibility); see VRP (Oct. 10, 1996) at 113-14. Most of the experts acknowledged that many labs used both techniques at the time of the hearing.

In addition to the expert testimony at the *Frye* hearing, we note that the scientific literature supports the conclusion that polymarker and D1S80 systems have achieved general scientific acceptance. In prior cases, the National Academy of Sciences' committee reports on use of DNA in forensic settings have been heavily relied upon by this court on the issue of general scientific acceptance. *E.g.*, *Copeland*, 130 Wn.2d 244; *Cauthron*, 120 Wn.2d 879. The 1996 report states: "We believe that [PCR-based] systems are ready to be used along with VNTRs [RFLP typing]. . . . We conclude that PCR-based systems should be used." COMMITTEE ON DNA FORENSIC SCIENCE: AN UPDATE, THE EVALUATION OF FORENSIC DNA EVIDENCE 119 (National Academy Press 1996). The report specifically describes use of DQ-alpha, polymarker and D1S80 systems. *Id.* at 71-72.

Published appellate court decisions overwhelmingly admit polymarker and D1S80 DNA evidence. *See People v. Wright*, 62 Cal. App. 4th 31, 72 Cal. Rptr. 2d 246 (1998) (under *Kelly-Frye* standard of admissibility; polymarker); *People v. Pope*, 284 Ill. App. 3d 695, 672 N.E.2d 1321, 220 Ill. Dec. 309 (1996) (*Frye*; polymarker); *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998) (*Frye-Houser* more stringent standard than *Frye* alone); polymarker); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (1997) (*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (variant; polymarker); *State v. Harvey*, 151 N.J. 117, 699 A.2d 596 (1997) (*Daubert*-like reliability standard; polymarker); *United States v. Beasley*, 102 F.3d 1440 (8th Cir. 1996) (*Daubert*; polymarker); *Redding v. State*, 219 Ga. App. 182, 464 S.E.2d 824 (1995) (reliability standard; D1S80); *Brodine v. State*, 936 P.2d 545 (Alaska Ct. App. 1997) (*Frye*; polymarker and D1S80); *State v. Van Adams*, 194 Ariz. 408, 984 P.2d 16 (1999) (*Frye*; D1S80 and polymarker); *Smith v. State*, 702 N.E.2d 668 (Ind. 1998) (reliability; polymarker and D1S80); *Commonwealth v. Vao Sok*, 425 Mass. 787, 683 N.E.2d 671 (1997), *abrogated on other grounds by Case of Canavan*, 432 Mass.

our purposes here, they are techniques which this court held admissible in *Cauthron, Copeland, Russell,* and *Gentry.* We decline to hold that each time new loci are involved in DNA testing, a *Frye* hearing must be held. We agree with other courts that have held that hearings are not necessary where PCR techniques have already been ruled admissible. *See, e.g., State v. Van Adams,* 194 Ariz. 408, 418-19, 984 P.2d 16 (1999) (*Frye*; PCR testing already ruled admissible; challenges involved DQ-alpha, polymarker, and D1S80 techniques); *Fugate v. Commonwealth,* 993 S.W.2d 931, 937-38 (Ky. 1999) (DNA comparison analysis using RFLP and PCR methods is admissible without being the subject of a pretrial *Daubert* hearing); *United States v. Beasley,* 102 F.3d 1440, 1448 (8th Cir. 1996) (*Daubert*; courts in the Eighth Circuit may take judicial notice of reliability of PCR method of DNA analysis).

We hold that the typing techniques used in this case were admissible without need for a *Frye* hearing, and that *Frye* hearings are no longer required as to admissibility of RFLP and PCR techniques like those used in this case.

■ Gore's primary challenge to the DNA evidence is that the trial court erred in admitting evidence of genetic profile frequencies using the product rule.

In *Copeland,* 130 Wn.2d at 270, involving RFLP typing, we concluded that the product rule for establishing statistical probabilities of a genetic profile in the human population is generally accepted within the scientific community, and therefore the product rule is admissible for determining the probabilities of a random match.

---

304, 733 N.E.2d 1042 (2000) (general acceptance or reliability/validity; polymarker and D1S80); *United States v. Gaines,* 979 F. Supp. 1429, 1437 (S.D. Fla. 1997) (*Daubert,* including a conclusion of general acceptance within the scientific community; polymarker and D1S80); *United States v. Shea,* 957 F. Supp. 331 (D.N.H. 1997) (*Daubert*; polymarker and D1S80), *aff'd,* 159 F.3d 37 (1st Cir. 1998); *United States v. Lowe,* 954 F. Supp. 401 (D. Mass. 1996) (*Daubert*; polymarker and D1S80); *cf. Watts v. State,* 733 So. 2d 214 (Miss. 1999) (opinion a little unclear, but evidently, under a reliability standard, polymarker and D1S80 methods admissible). Gore cites no published appellate decision rejecting admissibility of these PCR methods.

[T]he product rule (or "multiplication rule") as applied in RFLP typing means that the probability of a genetic profile occurring in the population is the product of the probabilities of each individual allele's occurrence in the population. Validity of the rule depends upon whether the individual alleles are actually statistically independent. . . . Two assumptions underlie use of the product rule when calculating genetic profile frequencies: linkage equilibrium, which means that the alleles at different loci are inherited independent of each other, and Hardy-Weinberg equilibrium, which means that one allele at a locus is not predictive of the other allele at that locus (one allele is inherited from the mother, the other from the father). Hardy-Weinberg equilibrium depends upon an assumption of a large population in which there is random mating.

*Copeland*, 130 Wn.2d at 264-65 (citations omitted).

We have not previously addressed the issue whether the product rule is admissible for determining statistical probabilities where PCR testing is involved. The issue here is whether the rule may be used to multiply results of the three PCR testing results (DQ-alpha, polymarker, and D1S80) together to determine statistical probabilities.

The chief questions raised by Gore are whether linkage equilibrium and Hardy-Weinberg equilibrium have been established for the alleles at loci involved in the PCR testing in this case. Dr. Chakraborty, who presented the testimony on statistical methodology for the state, testified that independence has been established and the product rule can be used. He further testified that the scientific community as a whole agrees with this conclusion. The trial court found Dr. Chakraborty's testimony "more persuasive than that of any of the other experts who testified to the contrary." VRP (Oct. 16, 1996) at 21 (judge's decision on admissibility). (This court has similarly noted that Dr. Chakraborty is a "preeminent expert in statistics and human genetics." *Copeland*, 130 Wn.2d at 266.) Dr. Mueller, who testified on the statistical issue for the defense, testified to the contrary.[9] Dr. Krane testified favorably to use of

---

[9] As to the experts, the trial court said that "I think it's significant that both Dr.

the ceiling principle, and testified that he did not agree with the second National Research Council (NRC) report that approved use of the product rule. As explained, the ceiling principle is an artificial, conservative method of calculating probabilities, originally developed to account for possible substructuring in human populations. However, as this court noted in *Copeland,* the second NRC report abandons the ceiling principle, as did this court in *Copeland.* Dr. Krane also testified there was heated debate in the scientific community as to use of the product rule in RFLP typing and PCR typing. Again, both the second NRC report and *Copeland* are to the contrary as to RFLP typing.

In addition to his experts' testimony at the *Frye* hearing, Gore also relies upon a paper written by Dr. Mueller in 1999 where Dr. Mueller claims to show that a validation study conducted by Dr. Bruce Budowle of the FBI and others is flawed. Lawrence Mueller, *DNA Typing Controversy and NRC II,* STATISTICAL METHODS IN THE HEALTH SCIENCES: GENETICS (1999), *quoted in* Appellant's brief, at 31-35. Dr. Mueller argues, among other things, that inaccurate results were reported, that the FBI database is too small, and that the results show departures from Hardy-Weinberg equilibrium. Dr. Libby offered similar testimony at the *Frye* hearing.

However, contrary to Gore's experts and Dr. Mueller's paper, a number of published articles have appeared in roughly the last five years which support use of product rule calculations using the PCR techniques at issue here. *See, e.g.,* Bruce Budowle et al., *D1S80 Population Data in African Americans, Caucasians, Southeastern Hispanics, Southwestern Hispanics, and Orientals,* 40 J. FORENSIC

Mueller and Dr. Libby [defense experts] have considerable personal financial interest in having the courts continue to hold there is a significant disagreement in the scientific community." VRP (Oct. 16, 1996) at 20 (judge's decision on admissibility). Mueller testified he made about $60,000 in 1994 and again in 1995 testifying for the defense. VRP (Oct. 9, 1996) at 150. This court has previously noted Dr. Mueller's financial stake (as well as his limited qualifications). *Copeland,* 130 Wn.2d at 267 n.5 (stating, among other things, that in 1990 to 1991 he made about $100,000 testifying for the defense). Dr. Mueller also continues to disagree that the product rule can be used where RFLP typing is involved. His position is clearly at odds with the National Research Council.

SCIENCES 38 (1995) (this appears to be the study about which Dr. Mueller complains); Bruce Budowle et al., *Validation and Population Studies of the Loci LDLR, GYPA, HBGG, D7S8, and Gc (PM loci), and HLA-DQα Using a Multiplex Amplification and Typing Procedure*, 40 J. FORENSIC SCIENCES 45 (1995); Susan Scholl et al., *Navajo, Pueblo, and Sioux Population Data on the Loci HLA-DQA1, LDLR, GYPA, HBGG, D7S8, Gc, and D1S80*, 41 J. FORENSIC SCIENCES 47 (1996); Mary Walkinshaw et al., *DNA Profiling in Two Alaskan Native Populations Using HLA-DQA1, PM, and D1S80 Loci*, 41 J. FORENSIC SCIENCES 478 (1996); Linda B. Jankowski et al., *New Jersey Caucasian, African American, and Hispanic Population Data on the PCR-based Loci HLA-DQA1, LDLR, GYPA, HBGG, D7S8, and Gc*, 43 J. FORENSIC SCIENCES 1037 (1998); W. Klitz et al., *Analysis of Genotype Frequencies and Interlocus Association for the PM, DQA1, and D1S80 Loci in Four Populations*, 45 J. FORENSIC SCIENCES 1009 (2000).

Moreover, the 1996 NRC report also states that the product rule may be used with PCR testing. COMMITTEE ON DNA FORENSIC SCIENCE: AN UPDATE, THE EVALUATION OF FORENSIC DNA EVIDENCE 119 (National Academy Press 1996). The report specifically states, as to the newest of the typing methods used here, D1S80, that it has been evaluated for agreement with Hardy-Weinberg. *Id.* at 117.

Other courts have found use of the product rule admissible based on PCR results. *People v. Wright*, 62 Cal. App. 4th 31, 72 Cal. Rptr. 2d 246 (1998) (under *Kelly-Frye* standard); *People v. Pope*, 284 Ill. App. 3d 695, 672 N.E.2d 1321, 220 Ill. Dec. 309 (1996) (*Frye*; polymarker and DQ-alpha); *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998) (*Frye-Houser*; polymarker and DQ-alpha); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (1997) (modified *Daubert*; polymarker); *State v. Harvey*, 151 N.J. 117, 699 A.2d 596 (1997) (reliability standard; polymarker); *United States v. Lowe*, 954 F. Supp. 401 (D. Mass. 1996) (reliability; polymarker and D1S80). A few courts have qualified use of the product rule. *Smith v. State*, 702 N.E.2d 668 (Ind. 1998) (reliability; product rule admissible; polymarker, D1S80;

attacks as to linkage equilibrium go to weight, not admissibility); *United States v. Shea*, 957 F. Supp. 331 (D.N.H. 1997) (*Daubert*; DQ-alpha, polymarker, D1S80; statistics using product rule admissible if method suggested in second NRC report followed).

We conclude that use of the product rule for calculating probabilities of a random match of a genetic profile in the human population is generally accepted in the scientific community and is admissible to calculate frequencies where the PCR-based systems at issue in this case are involved.

■ Finally, Dr. Riley also testified at trial that the calculations for the PCR testing and the RFLP testing could be combined by applying the product rule. Gore contends that general scientific acceptance of this use of the product rule is lacking. However, if independence of individual alleles is established, there is little reason to conclude that the product rule may not be used in this manner. While Dr. Mueller testified for the defense that the product rule could not be used this way, State's witness Dr. Chakraborty testified that it could be. THE COMMITTEE ON DNA FORENSIC SCIENCE: AN UPDATE, THE EVALUATION OF FORENSIC DNA EVIDENCE 119 (National Academy Press 1996), states that "it is quite proper to combine different systems . . . in the product rule, provided, of course, that the loci are close to [linkage equilibrium]."

We conclude that the trial court properly admitted the DNA evidence at trial.

### III. Standard of proof of factual basis for exceptional sentence upward

Gore maintains that the factual basis for an exceptional sentence upward must be charged, submitted to the jury, and proved beyond a reasonable doubt. He relies upon *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). In *Apprendi*, a New Jersey hate crime statute was at issue which authorized a judge to increase a

defendant's maximum prison sentence if the judge found by a preponderance of evidence that in committing the crime the defendant acted with a purpose to intimidate because of race. The Court concluded that the statute violated the defendant's Fourteenth Amendment due process rights and Sixth Amendment right to a jury trial. The court held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to the jury and proved beyond a reasonable doubt. Gore contends that the factual basis for aggravating factors supporting exceptional sentences upward under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, must similarly be submitted to the jury and proved beyond a reasonable doubt. *Apprendi* does not support Gore's position.

The Fifth Amendment due process clause requires that every fact necessary to conviction be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). However, not every fact relevant to sentencing is subject to this dictate. In *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986), the Court upheld the constitutionality of a Pennsylvania statute which required the sentencing judge to impose a five year minimum sentence where the judge found by a preponderance of the evidence that the defendant "was visibly possessed of a firearm" when committing one of certain enumerated felonies. Key to the Court's decision was that the Pennsylvania law "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty;" instead, "it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm." *McMillan*, 477 U.S. at 87-88. In the course of also rejecting the defendants' contention that a clear and convincing standard of proof should apply, if not the beyond a reasonable doubt standard, the Court observed: "Sentencing courts necessarily consider the circum-

stances of an offense in selecting the appropriate punishment, and we have consistently approved sentencing schemes that mandate consideration of facts related to the crime . . . without suggesting that those facts must be proved beyond a reasonable doubt . . . ." *McMillan*, 477 U.S. at 92.

In *Apprendi*, 530 U.S. at 476-77, the Court said that

> [a]t stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," Amdt 6. Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995).

The Court noted that the historical foundation for its holding extended through several centuries, adding that any distinction between an element and a sentencing factor was unknown in the practice of criminal indictment, trial by jury, and judgment by a court as it existed when this country was founded. *Apprendi*, 530 U.S. at 470. The Court also said, though, that "nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute." *Id*. at 481 (emphasis omitted). The Court also acknowledged that trial practice could change through centuries and remain true to the right to a jury, but said that the practice must remain true "to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reasonable doubt." *Id*. at 483-84.

Under the SRA, an exceptional sentence upward may be based upon statutory or nonstatutory aggravating factors. *See* RCW 9.94A.390. However, the sentencing judge

cannot impose an exceptional sentence greater than the statutory maximum based upon such factors. *See* RCW 9A.20.021; RCW 9.94A.120(14); RCW 9.94A.420. Accordingly, the factual determinations that support reasons for exceptional sentences upward fall within the *McMillan* type of case and not the *Apprendi* type. Aggravating factors neither increase the maximum sentence nor define a separate offense calling for a separate penalty. The state statutory scheme permits a judge to impose an exceptional sentence—still within the range determined by the Legislature and not exceeding the maximum—after considering the circumstances of an offense and, as *McMillan* and *Apprendi* indicate, it may do so without the factual determinations being charged, submitted to a jury, or proved beyond a reasonable doubt. *See McMillan*, 477 U.S. at 92; *Apprendi*, 530 U.S. at 481.

Gore makes an interesting, but unpersuasive argument based upon Justice Thomas' concurrence in *Apprendi*. There, Justice Thomas retreats from the position he took in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), a case where the majority, including Thomas, held that a sentencing court may determine the existence of a prior conviction, even where that fact increases the statutory maximum. Justice Thomas said that he joined the Court's opinion in *Apprendi* in full, but wrote because he believes an even broader rule should be adopted. *Apprendi*, 530 U.S. at 499 (Thomas, J., concurring). He said that "[i]f a fact is by law the basis for imposing or increasing punishment—for establishing or increasing the prosecution's entitlement—it is an element" which must be proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 521 (Thomas, J., concurring).

Gore apparently reads Justice Thomas' concurrence as altering the view of the Court as a whole, and seems to reason that a majority of the members of the Court would now conclude that factual determinations underlying exceptional sentences upward must be pleaded and proved beyond a reasonable doubt. However, the holding in

*Apprendi* is not that broad. Nor did the Court retreat from *McMillan*, *see Apprendi*, 530 U.S. at 487 n.13, nor did it even overrule *Almendarez-Torres*; *Apprendi*, 530 U.S. at 487 (though it called the decision "at best an exceptional departure from the historic practice that we have described"). Regardless of Gore's speculation, this court is bound by *McMillan* and *Apprendi*.[10]

We hold that the factual basis for an exceptional sentence upward need not be charged, submitted to the jury, and proved beyond a reasonable doubt.

### IV. Exceptional sentences

The trial court imposed exceptional sentences based on vulnerability of all of the victims and on preparation and planning by Gore. Gore contends that neither of these factors supports exceptional sentences because neither the victims' vulnerability nor the degree of preparation and planning distinguish his crimes from the usual crimes of first degree rape and attempted first degree rape.

 An exceptional sentence may be imposed only where the trial court finds substantial and compelling reasons, set forth in written findings and conclusions, which support an exceptional sentence. RCW 9.94A.120(2), (3); *State v. Halgren*, 137 Wn.2d 340, 345, 971 P.2d 512 (1999). In order to reverse an exceptional sentence, the reviewing court must find that (1) under a clearly erroneous standard there is insufficient evidence in the record to support the reasons for imposing an exceptional sentence, (2) as a matter of law an exceptional sentence is not justified by the reasons, or (3) under an abuse of discretion standard an exceptional sentence is clearly excessive. RCW 9.94A.210(4); *Halgren*, 137 Wn.2d at 345-46; *State v. Nordby*, 106 Wn.2d 514, 723 P.2d 1117 (1986). A reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the

[10] Gore does not raise any state constitutional issues.

offense. *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987); *Nordby*, 106 Wn.2d at 518.

Gore's challenges relate to whether as a matter of law the reasons given by the trial court support the exceptional sentences.

### a. Victim vulnerability

The first question is whether the trial court erred in holding that victim vulnerability justifies an exceptional sentence upward. Gore has not assigned error to any of the findings respecting vulnerability, and they are accordingly verities on appeal. *State v. Earls*, 116 Wn.2d 364, 372 n.3, 805 P.2d 211 (1991). The trial court's findings are:

(1) Each of the defendant's four victims were particularly vulnerable to the defendant's attack. The defendant was aware of this vulnerability in each instance and used it as a substantial factor in allowing him to commit each crime.

Ct. I. A. The defendant was aware of [A.O.'s] small size, and young age. He had made brief contact with her the day before he raped her. [A.O.'s] size, and her young age were substantial factors enabling him to rape her.

Ct. II. B. [K.S.] was under 5 ft. tall and/or 90 pounds when attacked by the defendant. The defendant was aware of this, both from the day of the attack and a day prior to the attack when he saw [K.S.] on the same road. [K.S.'s] small stature made her particularly vulnerable, and was a substantial factor enabling the defendant to attack her.

Ct. IV. C. [C.C.] was only 14 years old when attacked. She was just over 5 ft. tall and 100 pounds. The defendant was aware of this vulnerability, and it was a substantial factor enabling him to commit the rape of [C.C.].

Ct. V. D. [H.L.] was only 13 years old and just over 5 ft. tall and 100 pounds when the defendant attacked her. The defendant was aware of her apparent approximate age and size when he attacked her. Her

particular vulnerability was a substantial factor
enabling the defendant to attack [H.L.]

Clerk's Papers (CP) at 900.

 Particular vulnerability of the victim is a statutory
aggravating factor that may justify an exceptional sen-
tence. RCW 9.94A.390(2)(b) includes that "[t]he defendant
knew or should have known that the victim of the current
offense was particularly vulnerable or incapable of resis-
tance due to extreme youth, advanced age, disability, or ill
health." Small size is not one of the listed characteristics.
Gore does not complain that small size cannot be the basis
for a finding of vulnerability, and we note that RCW
9.94A.390's lists are illustrative nonexclusive factors that
the trial court may consider in exercising its discretion
whether to impose an exceptional sentence. It follows that
physical considerations other than those listed in RCW
9.94A.390(2)(b) may form the basis for a finding of vulner-
ability. However, given that vulnerability based on a
nonlisted characteristic has its origins in the statutory
factor, the statute's requirement of *particular* vulnerability
must still be satisfied.

The cases are in accord. *E.g.*, *State v. Sweet*, 138 Wn.2d
466, 482, 483, 980 P.2d 1223 (1999) (trial court's finding of
particular vulnerability justified exceptional sentence for
first degree assault where the defendant knew the victim
was particularly vulnerable and unable to defend herself
because of her age and stature; victim was a small woman
five feet, two inches tall and 52 years old); *State v. Sly*, 58
Wn. App. 740, 748-49, 794 P.2d 1316 (1990) (trial court's
finding of particular vulnerability justified exceptional sen-
tence for three counts of second degree robbery where
victims were small in stature, strangers to American cus-
toms, and easily frightened), *disapproved on other grounds
by State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991); *State
v. Holyoak*, 49 Wn. App. 691, 695, 745 P.2d 515 (1987) (trial
court's finding of particular vulnerability justified excep-
tional sentence for first degree assault where the victim

was only 14 years of age, approximately five feet tall, and weighed about 100 pounds).

 In order for the victim's vulnerability to justify an exceptional sentence, the defendant must know of the particular vulnerability and the vulnerability must be a substantial factor in the commission of the crime. *State v. Ross*, 71 Wn. App. 556, 565, 861 P.2d 473 (1993); *State v. Vermillion*, 66 Wn. App. 332, 348, 832 P.2d 95 (1992).

Here, there is no question that the victims were small in stature. Gore argues, though, that their small size is not an "extraordinary vulnerability" in commission of first degree rape, and points out that the assailant in each instance tried to overpower the victim without using a weapon of a kind which would make all victims vulnerable to injury. While all of these victims may not have been exposed to potential knife wounds or gunshot wounds, as Gore argues, they cannot be said to have escaped injury. Moreover, their small size actually made it easier for Gore to overcome any resistance without the need for weapons.

 Although the average size of victims of first degree rape and attempted first degree rape is not known, all of these victims were quite small and thus easily overpowered. The findings of vulnerability based on small stature support the imposition of the exceptional sentences. *See Sweet*, 138 Wn.2d at 483 (assault victim was a small woman five feet, two inches tall and 52 years old). We note this is especially true as to three of the counts where the sentencing judge also found that the victims were young as well as small in size, and thus particularly vulnerable. *See Holyoak*, 49 Wn. App. at 695 (assault victim was only 14 years of age, approximately five feet tall, and weighed about 100 pounds).

We uphold use of victim vulnerability as a reason for imposition of the exceptional sentence as to each count.

### b. Preparation and planning

The trial court also held that exceptional sentences were justified due to preparation and planning. Again, Gore has

not assigned error to any of the trial court's findings on preparation and planning, and they are verities on appeal. The trial court found:

(2) Each of the defendant's attacks and rapes showed evidence of planning and preparation beyond what is normally associated with the crimes charged. It is apparent that none of his attacks were random or "spur-of-the-moment," but were the result of substantial planning, including selecting victims in advance.

Ct. I. A. The defendant saw [A.O.] the day before he raped her. He came back the next day to the same wooded trail. The defendant had observed the victim and the location the day before the rape. He used his knowledge of both as a substantial factor enabling to rape [A.O.], and escaped undetected.

Ct. II. B. The defendant had seen [K.S.] on a morning shortly before he attacked her. On the day he abducted her, he was prepared with a face mask and gag. His prior contact with victim and possession of mask and gag were all in preparation for the attack. The planning and preparation were substantial factors enabling the defendant to attack [K.S.], and escape undetected and unidentified.

Ct. IV. C. The defendant had worked on the street adjacent to [C.C.'s] house. He had seen her. He had a mask to wear. The defendant had to drive to Lake Stevens, and get there in time to intercept [C.C.] The defendant's planning and preparation were substantial factors enabling him to rape [C.C.] and escape undetected.

Ct. V. D. When the defendant attacked [H.L.], he was able to quickly get into the woods, intercept her and get out quickly (by a different route) when spotted by passerby. His actions showed knowledge of the wooded area involved. The defendant had a full-faced mask which he carried in preparation for attacking the victim. His preparation was a substantial factor enabling him to attack [H.L.], and escape undetected and unidentified.

CP at 900-01.

■■ ■■ RCW 9.94A.390(2)(d)(iii) lists a "high degree of sophistication or planning" as a factor used to identify "major economic offense[s] or series of offenses" which justify an exceptional sentence. RCW 9.94A.390(2)(e)(v) similarly lists "a high degree of sophistication or planning" as identifying a major violation of the Uniform Controlled Substances Act, chapter 69.50 RCW, justifying an exceptional sentence. The statute does not address planning or sophistication relating to other offenses. However, in *Dunaway*, 109 Wn.2d at 218, this court rejected planning as an aggravating factor on the basis that planning was already included in the premeditation element of attempted first degree murder, the offense for which the defendant was sentenced, and therefore could not be considered for purposes of an exceptional sentence. We did not, however, reject planning on the basis that it could not serve as an aggravating factor where offenses other than economic and drug offenses are concerned. Several decisions have recognized sophistication and planning as nonstatutory aggravating factors where other offenses are concerned.

In *State v. Vaughn*, 83 Wn. App. 669, 679-80, 924 P.2d 27 (1996), the court held that an exceptional sentence for first degree kidnapping and rape of a child was justified where the defendant spent a protracted period of time in the victim's neighborhood watching children, learned the victim's mother's and siblings' names, told many lies to facilitate the crime, identified in advance the place where the rape took place as a potential site if he acted on his fantasies, outfitted his car in a way which facilitated the rape (by carrying a foam pad and a sleeping bag), and took steps to hide what was in the car, his pornography, and his whereabouts at the time the crime was committed. In *State v. Vermillion*, 66 Wn. App. 332, 832 P.2d 95 (1992), the court held that an exceptional sentence for first degree possession of stolen property, indecent liberties by forcible compulsion, unlawful imprisonment, and first degree burglary was justified where the defendant sought out his victims, assumed a false identity and personal history, reviewed

possible locations and selected remote sites for commission of the offenses, carried no identification, concealed where he was staying, and used a car which could not be traced to him, conducted himself in an appropriate fashion until the time of commission of the offenses, and carried items to be used in tying up victims.

The findings in this case do not show the same degree of sophistication or planning as in these cases, nor does the planning and preparation here distinguish these crimes from many other rapes and attempted rapes. Extrapolating from the statutory aggravating factors respecting economic and drug crimes, a *high degree* of sophistication or planning is necessary for the nonstatutory planning aggravator to justify an exceptional sentence, and the offenses here do not show a high degree of sophistication or planning.

We hold that preparation and planning do not support an exceptional sentence as to any of the counts.

### c. Whether remand necessary

The next question is whether the exceptional sentences should be upheld on the basis of victim vulnerability alone or whether remand for resentencing is necessary. An exceptional sentence may be affirmed where only one of the trial court's reasons for imposing an exceptional sentence is upheld; however, remand for resentencing is necessary where it is not clear whether the trial court would have imposed the exceptional sentence on the basis of the factor which is upheld. *State v. Gaines*, 122 Wn.2d 502, 512, 859 P.2d 36 (1993).

Here, the trial court's conclusions of law state as to each count that the particular vulnerability of each of the victims alone justifies an exceptional sentence. There are no contrary indications in the record. Accordingly, we conclude that the trial court would have imposed the exceptional sentences solely on the basis of victim vulnerability, and therefore Gore's exceptional sentences are affirmed on the basis of victim vulnerability.

## Conclusion

We conclude that Gore was not improperly denied a *Franks* hearing on the sufficiency of the affidavit in support of probable cause to issue the July 5, 1995, search warrant for blood and saliva samples, and photographs of the defendant. DNA evidence involving PCR techniques was properly admitted, as was use of the product rule to calculate genetic profile frequency results. The factual basis for imposing exceptional sentences upward does not have to be charged, submitted to the jury, and proved beyond a reasonable doubt. Finally, although exceptional sentences are not justified by the preparation and planning of the offenses, they are justified based upon the victims' vulnerability.

Affirmed.

SMITH, JOHNSON, IRELAND, and BRIDGE, JJ., and GUY and TALMADGE, JJ. Pro Tem., concur.

ALEXANDER, C.J. (concurring) — I agree with the result reached by the majority. I write separately simply to indicate that the majority opinion goes too far in implying that "preparation and planning" justifies an exceptional sentence for either first or second degree rape. As the majority points out, there are statutes that list a " 'high degree of sophistication or planning' " as a factor that justifies an exceptional sentence for major economic offenses or violations of the Uniform Controlled Substances Act. Majority at 320. There are, however, no statutes that provide that this factor justifies an exceptional sentence for any other category of offenses. This is significant because the legislature's inclusion of "a high degree of sophistication or planning" as a factor justifying an exceptional sentence for a certain category of offenses suggests to me that it may not be considered in the sentencing of individuals for other offenses.

Although the majority cites decisions from the Court of

Appeals that stand for the proposition that extensive planning may justify an exceptional sentence for offenses other than major economic offenses or major violations of the Uniform Controlled Substances Act, this court has never reached such a conclusion. Absent clear direction from the legislature, we should refrain from recognizing "preparation and planning" as a proper basis for an exceptional sentence. That conclusion seems particularly compelling where, as here, recognition of the factor is unnecessary to our resolution of the case, since the findings do not show the degree of sophistication and planning that would justify an exceptional sentence even if that were a factor that could be considered by the sentencing court.

SANDERS, J., concurs with ALEXANDER, C.J.